UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| V. : | Docket No. 22-CR-55 (DLF) |
| MARCOS PANAYIOTOU : | SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT |

**SENTENCING MEMORANDUM**

Marcos Panayiotou is a 30-year-old, married, United States Marines veteran, with some college education, who works as an independent swimming pool maintenance contractor. He has no criminal history, no children (yet), has forgone his right to indictment, pled guilty, and has cooperated in all aspects and in accordance with his plea agreement. Marcos Panayiotou has no incendiary social media postings and was not one of the people who engaged in violence or property destruction.

Marcos Panayiotou drove to Washington, D.C. the night of January 5, 2020, and the next day, met his parents at a protest where President Trump spoke. Then, he alone traveled to the Capitol. As the evidence shows in this case, for approximately 35[1] or 39[2] minutes, he walked the corridors of the Capitol building. He touched no one and nothing. In all the video produced by the Government, undersigned has been unable to find even one instance of Marcos Panayiotou making any incendiary statements that support violence or bragging about being in the building. Nor does the Government point to any.

Eleven months later, Marcos Panayiotou was arrested in his home. He has since pled guilty and faces a misdemeanor, non-guidelines sentence of up to 6 months in

---

[1] U.S. Probation Sentencing Recommendation at page 2. Dkt. #26.
[2] Government's sentencing memo, (Gov't Br.) at page 2.

prison.[3] He has agreed to pay restitution of $500 and at his sentence will be ready to provide a U.S. Post Office money order for the same as well as the $110 special assessments.

A balance of the § 3553(a) factors in this case weighs in favor of a sentence that includes a three-year term of probation with conditions. In addition to standard supervision conditions, the special conditions that address the particular needs of this case include, at most, 30 days of home detention, and 60 hours of community service.

Marcos Panayiotou faces sentencing for "Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), a class B misdemeanor or "petty offense." 18 U.S.C. § 19; 18 U.S.C. § 3559(a)(7). The statute carries a maximum incarceration period of six months. 18 U.S.C. § 3581(b)(7). The United States Sentencing Guidelines (Guidelines) do not apply. U.S.S.G. § 1B1.9. If the Court imposes any period of incarceration, the law does not permit the imposition of a term of supervised release to follow. 18 U.S.C. § 3583(b)(3). Nor does the law permit a period of probation to follow a term of imprisonment.[4] Thus, the Court's sentencing options are either 1) a straight period of incarceration; or 2) a term of probation up to five years with conditions tailored to the needs of the particular case. In assessing the appropriate sentence, the Court must consider the sentencing factors set forth in 18 U.S.C. § 3553 (a) and arrive at a sentence that is "sufficient but not greater than necessary" to meet those factors. Moreover, the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *United States v. Jones*, 846 F.3d 366, 372 (D.C. Cir. 2017)

---

[3] U.S. Presentence Report (PSR) cover page. Dkt. #25.
[4] See 18 U.S.C. § 3551, which states, in the disjunctive, that "[a]n individual found guilty of an offense shall be sentenced, in accordance with the provisions of section 3553, to—
(1)     a term of probation as authorized by subchapter B;
(2)     a fine as authorized by subchapter C; or
(3)     a term of imprisonment as authorized by subchapter D.
See also 18 U.S.C. § 3561(a)(3) (prohibiting probation when a "defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense.").

13

(citing *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)).

A balance of the § 3553(a) factors in this case weighs in favor of a sentence that includes a three-year term of probation with conditions. In addition to standard supervision conditions, the special conditions that address the particular needs of this case include no more than 30 days of home detention, and 60 hours of community service.

### A. Like U.S Probation suggests, Marcos Panayiotou's personal history and characteristics weigh in favor of a probationary sentence.

Marcos Panayiotou is married, works, and is an otherwise "regular guy." His participation in the events of January 6th have been widely publicized and have made him recognizable in his home community and within the military. His family and friends are acutely aware of his actions.

Marcos Panayiotou is equally disappointed in himself. His life has dramatically changed since January 6th. He regrets going to Washington, D.C. What began as a trip to hear what he thought would be the President's last speech turned into a mob talking control of the halls of Congress. Marcos Panayiotou went to hear the speech of "his President," that was his way of peacefully demonstrating. On that trip, Marcos Panayiotou, who had never been to the Capitol, was struck with a sense awe for the opulent history and the beauty of the buildings. After walking the corridors, he experienced no violence against others and returned home.

Marcos Panayiotou did not intentionally make his way to the front of the crowd in an effort to breach any door, he just moved closer as the crowd became deeper behind him. He did not break windows or commit any destruction of property whatsoever nor did he touch anyone or hurt anyone. As the Government's video exhibits show, the crowd was extremely tightly packed together at the top of the stairs outside the entrance.

13

At that point, Marcos Panayiotou clearly knew that he could have stayed at the door, could have waited for a break in the crowd, and could have left. He admits he did not do this. Instead, he walked further into the building. In what he regrets as the biggest mistake of his life, he went with the crowd, which walked. He recorded himself and took pictures. Neither at the time, nor after, did he make any incendiary comments or endorse violence. He admits feeling a misplaced sense of being part of history, but he never has, and never will, advocate for violence.

     Marcos Panayiotou broke from the crowd then and decided to leave the building and since then, and contrary to the Government's assumptions, he understands the gravity of what happened.  He is ashamed of himself and was, quite frankly, in the immediate aftermath of the day.  He is embarrassed for himself, his wife, those family, friends, and U.S. Marines brothers who, he believes have lost faith in him.

      Going forward, he is a changed person.  He no longer trusts the veracity of any news source and, frankly, does not trust his own ability to ferret through the conflicting information on social media. He no longer participates in any conversations about politics among his peers.  Any discussion of politics makes him feel sick to his stomach. Instead, Marcos Panayiotou is struggling to find some normalcy in his relationships with his remaining family, friends and U.S. Marines brethren, and to move on from what he considers the biggest mistake of his life.

     Marcos Panayiotou is focused on his marriage, his work, his family and building a new life in light of this conviction. Below is a picture of him, his wife, Marisa, and mother at his wedding.

13



**B. The nature and circumstances of the offense are very serious.**

There is no question that the historical events of January 6th were gravely angerous to the country's democracy. The former President of the United States perpetuated a statements about the results of an alleged unfair election, and that was propagated over and over again on social media and in news outlets. It is accurate to say that many participants truly believed that the election had been stolen. Marcos Panayiotou's intent was just to peacefully protest but the events that unfolded were planned by people other than him. In time, perhaps the country will more fully understands how much planning went into the insurrection and how high into the government that planning went.

13

Whatever those answers turn out to be, Marcos Panayiotou recognizes that it was the individuals like him – and their willingness to follow along when the building's doors were breached – that allowed what began as a peaceful demonstration to turn into a mob. While he committed no physical harm, nor any destruction of property himself, he understands that his willful presence where he was contributed to a gravely serious assault on the Capitol. For this reason, he must concede that, though he is charged with but a Class B misdemeanor, the least serious criminal offense in the code, his minor individual actions cannot be fully divorced from the conduct of the whole.

Marcos Panayiotou thoughtfully articulated his acceptance of responsibility, which is included in the Presentence Report, willingly signed the government's request for a statement of offense, affirmatively responded to all plea allocution questions, met with the F.B.I., the government and defense counsel in accordance with his plea and answered all questions asked of him. During the F.B.I. interview, Marcos Panayiotou was asked about the details and circumstances that led to him getting to D.C. and ultimately entering the Capitol Building. He answered all questions posed. When he asked to profess an acceptance of responsibility or remorse or contrition, the undersigned advised that in response to the draft Presentence Report, we would provide his statement. Now, the government claims that because they did not hear it first-hand, that he shows no remorse and therefore merits a custodial sentence. This position is improper.

Additionally, because he is veteran U.S. Marine, the government contends that he should presumably know better and not engage in such conduct. This position is also improper in light of (1) the fact that his service to this country, in part, is based on his belief that to peaceably assemble and protest is paramount to our freedom, and (2) in his

13

acceptance of responsibility, Marcos Panayiotou states his gratitude for the right to a federally appointed counsel, his shame for putting all through this and his respect for our laws. Marcos Panayiotou has not put the system "to the test" by demanding he be indicted, tried, face his accuser and witnesses, etc. Instead, he has reflected on his wrongfulness and has accepted a plea of guilt. In-fact, Marcos Panayiotou prepared the following for sentencing, to read to the Court:

*Good morning Judge Friedrich and all present today.*

*I have asked for an in-person sentencing hearing in light of the availability of doing this virtually because I have thought long and hard about this and I know that someday in the future, I will have to explain this conviction to employers, and my future children, and grandchildren. And I have thought over and over of how I have grown and continue to grow from this experience and am determined to turn this poor choice of judgment, a negative, into a positive and teaching moment for my legacy.*

*And it all starts by showing up. I may be young, but I am also a little old-school. When you mess up, you own up and you don't do it via email or text or even a call, you show up and you face your person, and you apologize. And it's not no half apology with "sorry… BUT." No. It is an "I'm sorry. My actions hurt you and others and that has is just wrong. And I am here to look you in the face, standing up tall and tell you this. I am not hiding behind a screen or phone; I am right here. And, I will never do it again. I ask that you forgive me."*

*I plan to tell my children and their grandchildren that I served the great military of this country for the freedoms of this amazing*

13

*country and when I even exercised my right to protest, I entered the Capitol Building on January 6th without permission, with an enormous group and the harm caused, stained our country. And while I touched no one, broke nothing and left, that was not enough. I misjudged a moment in time by partaking in it and that hurt many. I engaged in conduct where others looking on, saw a body (me) that added to a huge crowd that violated the sacredness of that building and our country's principles. And I paid a great price for that with the scarlet letter that is this federal conviction.*

*The moral of the story is that I also, the same way I drove over four hours to get there to protest, I also drove the four hours to tell that Judge, in person, that I was sorry because she and our entire country deserve better. I will not stand behind a device, I did not do it on January 6th and did not do it the day I faced my Judge. And that, is respect for the people this country. I owned up my wrong by showing up.*

*Judge Friedrich, I tell you this so that you know that I am not hiding behind anything. I cooperated with law enforcement, I owned up and I leave my fate in your hands. I also want you to know that this is not the sum of me, and I will never be before this Court nor any other court for the rest of my life.*

*Thank you.*

*Marcos Panayiotou*

### C. Probation with an onerous condition of home detention will reflect the seriousness of the offense, promote respect for the law, and provide just punishment under § 3553(a)(2)(A).

The seriousness of the offense and respect for the law can be addressed through conditions of probation that are punitive, including and at most, 30 days of home detention. First, perhaps because the United States Sentencing Guidelines place so much emphasis on incarceration, the infringement on one's liberty occasioned by supervised probation is sometimes forgotten. *See Gall v. United States,* 552 U.S. 38, 48, 128 S. Ct. 586, 595, 169 L. Ed. 2d 445 (2007) ("We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.

Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty."(citations omitted); *see also, Frank v. United States*, 395 U.S. 147, 151, 89 S. Ct. 1503, 1506–07, 23 L. Ed. 2d 162 (1969) (while "certainly a less onerous restraint than jail itself," probation is "a significant infringement of personal freedom."). When coupled with home detention, that infringement on freedom is clearly even more onerous and serves a punitive function. *See United States v. Testerman*, 446 F. Supp. 2d 640, 643 (W.D. Va. 2006) ("obligations of probation, home detention, and a fine, are of themselves just punishment."). *Cf. United States v. Martin,* 363 F.3d 25, 39 (1st Cir. 2004) (Where Defendant has served time in home detention that will not be credited toward his new sentence [by the Bureau of Prisons], he has served a portion of the 'just punishment for the offense. . .'"); *United States v. Perry*, 473 F.Supp.3d 1250, 1254 (D. Co. July 20, 2020)(granting compassionate release, converting 36-month prison term to "time served" and imposing 33 months of home detention as a condition of supervised release because home confinement "will continue to impose just punishment for his offense[ ] by restricting his liberty. . .").

Supervised probation with home detention and community service has sufficient

13

"teeth" to promote respect for the law, provide just punishment and address the seriousness of the offense. It is "no greater than necessary" to meet these sentence goals.

### D. General and personal deterrence can be effectuated with probation not incarceration.

Probation recommends a term of probation for a reason. Incarceration is not the best means to effectuate general deterrence in this case especially, where Marcos Panayiotou's involvement was minimal. Most jurists and practitioners before January 6th would fairly confidently assume that incarceration was not necessary to meet the sentencing goals for a conviction of a class B misdemeanor, at least in the vast majority of cases. Here, the events of January 6th have been widely publicized around the world.[6] The Government continues to locate and charge low level participants like Mr. Panayiotou. As of last year, over 700 individuals have been charged.[7]

While the seriousness of the offense is unique for its historical context, it is also unique in its widespread publicity. The fact that over 700 people have been apprehended and prosecuted for low-level offenses offers significant general deterrence because of that publicity. The certainty of apprehension, and not the length of the sentence, is the prime factor in deterrence, not the length of incarceration imposed.[8] It is fair to conclude that the sheer number of January 6th cases thus far have shown the general public that

---

[6] *See "AP Photos: Scenes of violence at U.S. Capitol shock the world,"* AP News (January 6, 2021), available at: https://apnews.com/article/joe-biden-donald-trump- electoral-college-elections-de812995a8c7cbea5c1de56a3d1aa007

[7] *See* Hall, M., *et al.*, *"719 people have been charged in the Capitol insurrection so far. This searchable table shows them all,"* Insider (December 6, 2021), available at: https://www.insider.com/all-the-us-capitol-pro-trump-riot-arrests-charges-names-2021-1

[8] *See* Wright, V., PhD, *"Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment,"* Sentencing Project (November 2010), available at: https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf ("Research to date generally indicates that increases in the certainty of punishment, as opposed to the severity of punishment, are more likely to produce deterrent benefits.") (last accessed November 2022).

apprehension is certain for even the most minor participants. It is for this reason that incarceration is not necessary to further the goal of general deterrence. The general public is already well aware that participation in events such as the January 6th insurrection will bring swift prosecution. The most serious offenses are rightly being resolved by sentences of imprisonment. Supervised probation -- with onerous conditions such as home confinements and community service -- is sufficient to meet the goal of general deterrence given the widespread public knowledge of these cases.

  Moreover, incarceration is not necessary to incapacitate Marcos Panayiotou or prevent him personally from committing other crimes. First, the statute itself limits the possible incarceration period to six months, so the incapacitation argument is weak at the outset. There is nothing in Marcos Panayiotou's record counseling the conclusion that he is so incorrigible that the public needs to be protected from further crimes even for a short period of time. Second, while he has a prior disorderly misdemeanor, it is minor and directly tethered to this case – he was lawfully licensed to possess a firearm and ammunition in Pennsylvania but in New Jersey the ammunition was prohibited.  This came to light when he was arrested, and his home was searched.

  Just days after his arrest, he was tested for drugs and tested positive for marijuana because just days before he had used marijuana. Two months later he tested positive again.  Seven months later, he tested positive again.  At most, two positive drug tests for marijuana count here and any continued use requires treatment not incarceration.  Otherwise, Marcos Panayiotou has been on pretrial supervision without incident since the inception of the case on which suggests he can be successfully supervised in the community.

16

### E. The need for the sentence to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner" counsels in favor of probation.

Marcos Panayiotou, as sentencing for this case has approached, has been anxious and depressed. A sentence of probation that includes a condition for substance abuse treatment will meet the need for the Court's sentence to provide him the necessary treatment in the most effective manner. This is especially helpful and appropriate in light of the fact that he has his own health insurance. A straight term of incarceration will provide no mental health care opportunities and there will be no supervised release to follow, so no conditions of post-incarceration supervision could ensure the Court that he is getting the necessary care.

### F. Probation with home confinement and community service will not create unwarranted sentencing disparities among similarly situated defendants.

Section 3553(a)(6) requires the Court to consider "the need for the sentence imposed to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." The operative word, is, of course, "unwarranted," recognizing that there may be particular circumstances of a case that do warrant differences in the sentences imposed.

Here, the Court is distinguishing among numerous defendants charged with the same class B misdemeanor. Thus, what seem to be emerging as pivotal factual benchmarks of differentiation include the level of remorse, or acceptance of responsibility, that a particular January 6th defendant expresses, and whether there were incendiary social media postings by a particular defendant that suggested a lack of appreciation for the wrongfulness of the participation. Factors including whether the person engaged in violence or property destruction were considered in the Government's charging decision, so the universe of defendants who entered guilty pleas to §

16

5104(e)(2)(G)("Parading, Picketing or Demonstrating), by definition engaged in no violence or property destruction. Finally, conduct during their time in the building is also a differentiating factor.

On one end of the spectrum are cases like Jennifer Leigh Ryan, (21-cr-00050 CMC)), in which the Government sought, and the Court agreed to, a sentence of 60 days incarceration. *See* Dkt. #48 (Government Sentencing Memorandum). In Ms.Ryan's case, she used a platform as a social media influencer to broadcast to millions of people her utter disdain for the prosecution after the events of January 6th. During the rioting, she livestreamed incendiary comments about going to "war" and commending property destruction. *Id*. After the riot, on national television, she called herself a "martyr" and continued not only to express pride in her involvement in the riot ("I did nothing wrong"), but also to spread false information about the violence, contending that the participants were all peaceful. *Id*. Even at her interview with probation, she minimized her conduct and said she did not know about the riot when going to the Capitol. *Id*. This, despite livestreaming from her hotel room that they were going to the Capitol to start war after publicizing the breach of the building and destruction of property being reported in the news. *Id*.

Finally, long past the events of January 6th, Ms. Ryan said to a national audience that she would never go to prison because of her appearance and social status.[9] *Id*. This person was sentenced to 60-day incarceration despite, similar to Mr. Panayiotou, having a minor prior conviction. *Id*. Yet, the Government here seeks a 45-day sentence for Marcos Panayiotou. There seems to be little uniformity in the Government's sentencing recommendations, as there are major differences in Mr. Panayiotou's posture towards his case and Ms. Ryan's.

Marcos Panayiotou's response to his prosecution has been the polar opposite of

16

Jenna Ryan's. He made no posts about his presence at the Capitol on social media after January 6th. Unlike Ms. Ryan who was defiant in her posture towards the case, asserting after the riot that she had a right to be there. *See* 21-cr-303 (ABJ), Dkt. (criminal complaint against Deborah Lee). Mr. Panayiotou has repeatedly expressed remorse about his participation in the events of January 6th. He cooperated with FBI. He entered a timely guilty plea.

Mr. Panayiotou's case is also distinguishable from the *United States v. Russell Peterson* case, in which this Court sentenced Mr. Peterson to 45 days. *See* 21-cr- 309 (ABJ), Dkt. #32. In that case, the Court was particularly troubled by Mr. Peterson's social media posting after the riot in which he minimized the severity of the riot by saying he had "stormed the castle, broke into chambers, and smoked a blunt on the couch. Overall, I had fun. LOL." *See* Dkt. #32 at 19 (Sentencing Minutes). During the time he was in the building, he livestreamed and said that they had "taken the Capitol." Mr. Panayiotou made no such statements.

The Government suggests that others with more serious criminal records than Mr. Panayiotou are in the universe of comparable cases. ("Notably, most of these defendants have criminal histories that are extensive, qualitatively worse, or both."). Some of the cases the government lists in its exhibit are for defendants who were detained and were sentenced to 6 months' time-served because they would overserve the statutory maximum. These cases are not appropriate comparison cases.

---

[9] Ms. Ryan is reported to have said more specifically that "I have blonde hair white skin a great job a great future … sorry to rain on your hater parade. I did nothing wrong." *See* Klawins, J., "*Jenna Ryan, 'White' 1/6 Rioter Who Said She'd Avoid Jail, Now Plans to 'Detox' in Prison*," Newsweek (December 2021), available at: https://www.newsweek.com/1-6-rioter-who-said-shed-avoid-jail-because-shes-white-now-plans-detox-prison-1656631 .

The Government argues that Mr. Panayiotou deserves 45 days because his conduct was more serious than those defendants with more serious criminal records. To the contrary, the other cases appear to present defendants with equally or more serious conduct on January 6th. See United States v. Lolos, 1:21-cr-00243 (APM). Mr. Lolos, who was sentenced to 14 days, is said to have spent 43 minutes in the building, about the same as Mr. Panayiotou. *See* 1:21-cr-00243 (APM) Dkt. #32 (Government Sentencing Memorandum). While the Government sought 30 days incarceration in that case, it is hard to see a principled distinction in the request the Government makes here for a 45-day sentence. Mr. Lolo's conduct in the building was more disturbing than Marcos Panayiotou's. He was waving his flag and chanting and only left after being confronted by "heavily armed officers." *Id*. Finally, after the insurrection, he was so recalcitrant that he was removed from a commercial airplane for disrupting other passengers with his chants of "Trump 2020." He was in fact charged for his conduct on the plane. *Id*. at 12.

In the *United States v. Robert L. Bauer* case, 1:21-cr-00049 (TSC), the Government sought a 30-day sentence despite the fact that Mr. Bauer showed no insight into the wrongfulness of his actions, telling the FBI that "I don't feel like I done nothing terribly wrong." *See* 1:21-cr-00049 (TSC), Dkt. #33 at 10-12. (Government Sentencing Memorandum). While in the building less time than Mr. Panayiotou, Mr. Bauer went to the location where police officers were being assaulted. He had an extensive criminal record, including felony convictions and prior prison sentence of 3 years. *Id*. Mr. Panayiotou witnessed no assaults on officers. Mr. Panayiotou took video of his travels inside the building.

There is no evidence, for instance, that Mr. Panayiotou used a fire extinguisher to break glass to get in. He did not take video of himself bragging or make false or inflammatory statements about his actions in the Capitol. He made no other social media posts bragging about his actions after they left the building.

The Government makes much over Mr. Panayiotou's position to see other defendants' actions, specifically the breach of the police line outside the House chamber in the hallway. Mr. Panayiotou may have been in a position to see it, but he did not.

Lastly, Mr. Panayiotou's failure to affirmatively express regret for his involvement on January 6th in his FBI interview is not indicative of a lack of remorse, he was advised my counsel that in response to the draft PSR we would provide his statement because the plea agreement only asked that he answer their questions with regards to the events of that day.   He answered the questions posed to him in the interview. In all other respects he was forthcoming. He promptly entered his guilty plea because he wanted to take responsibility and move the matter behind him as quickly as possible for himself and his family. That he was advised by counsel to save his acceptance of responsibility at the time of the FBI interview, something not delineated in the plea agreement.  should not lump him in with cases where the defendant actively expressed having done  nothing wrong, which is a clear expression of lack of remorse.

**G. Conclusion**

For the foregoing reason, Mr. Panayiotou asks the Court to impose a sentence of three years of probation, no more than 30 days of home confinement, and 60 hours of community service.  He also requests substance abuse treatment for his use of marijuana.

Finally, Mrs. Panayiotou respectfully submits a letter to the Court attached

20

as exhibit A.

                                            Respectfully submitted,

                                            Carol Dominguez,
                                            Assistant Federal Public Defender
                                            Counsel for Marcos Panayiotou